# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### MIAMI DIVISION

### CASE NO. 16-23939-CIV-GOODMAN
### [CONSENT CASE]

DAWN DAWSEY,

      Plaintiff,

v.

CARNIVAL CORPORATION, et al.,

      Defendants.

_____/

## <u>OMNIBUS ORDER ON DEFENDANTS' SUMMARY JUDGMENT MOTIONS</u>

This case is about a passenger who received a massage aboard a cruise ship. Massages, of course, are supposed to be enjoyable. Therapeutic. Beneficial. Stress-reducing. Remedial. Restorative. Healthful. Relaxing. And maybe even invigorating. But if Plaintiff Dawn Dawsey's allegations are correct, then the bamboo massage she received in a spa aboard the Defendant Carnival Corporation's cruise ship *Elation* was a far cry from any of these things (and she surely was not elated with the result).

Not only does Dawsey contend that the bamboo massage was not soothing or curative, but she alleges that it was painful and injurious -- and fractured her hip. She also claims that Carnival negligently selected and retained Defendant Steiner Transocean Ltd., the spa company whose masseuse, Defendant Nerissa Pantaleon,

supposedly gave her the injury-producing massage. The fractured hip later required surgery and extensive medical treatment and rehabilitation.

Defendants stridently dispute Dawsey's claims. They say that Dawsey suffered from preexisting conditions but lied about them in this lawsuit. They also say that Dawsey failed to complain to Steiner or Carnival during and immediately after the massage. And they say that the massage did not cause Dawsey's hip injury.

Each side has submitted expert witnesses to support their view of causation. Dawsey retained an expert who, despite never examining her and never reviewing her pre-cruise medical records, opined that the massage did, in fact, cause the hip fracture. Defendants, for their part, retained an expert who opined that the massage did not cause the fracture.

Defendants each filed summary judgment motions, Dawsey filed opposition responses, and Defendants filed replies. [ECF Nos. 36–37; 39–40; 43–44].

As outlined below, most of the critical facts -- such as whether Dawsey complained to the masseuse about pain *during* the massage and whether the massage caused her hip fracture -- are disputed. Some of the other material facts are not in dispute. Still others are not actually in dispute because Dawsey provided what the Court typically describes as a non-response response: Carnival or Steiner will allege Fact A, and instead of contending that Fact A is disputed or conceding that it is un dispute, Dawsey will volunteer Fact B, which is typically a *related* fact but which does

not directly address Fact A. When that happens, the Court deems Fact A undisputed, provided that the record evidence supports it.

One of Defendants' primary arguments -- that Dawsey did not submit expert testimony on causation -- is now moot for two reasons. First, a prior judge presiding over the case permitted her to submit expert testimony. [ECF No. 54]. And the Court recently denied Defendants' motions to exclude expert testimony about causation. [ECF No. 86].

In any event, for the reasons outlined in detail below, the Court **denies** Steiner's motion but **grants** Carnival's motion.

The Court **denies** Steiner's motion for two reasons. First, the Court has permitted Dawsey to introduce expert testimony on causation. Second, Steiner comes well short of proving that Dawsey perpetrated a fraud on the Court. At most, Steiner may have demonstrated that Dawsey's discovery responses about her medical history were incomplete. Steiner can present those arguments to a jury, of course, but they are not appropriate for summary judgment resolution.

The Court, however, **grants** Carnival's motion for three reasons. First, Dawsey cannot now -- in a memorandum opposing a summary judgment motion -- pursue for the first time an agency theory against Carnival. She never asserted in any way -- directly or indirectly, expressly or implicitly -- those claims in her amended complaint (or in her initial complaint, for that matter). [ECF Nos. 1; 23]. Second, the undisputed

evidence shows that Carnival conducted a diligent inquiry into Steiner's fitness to run spas on its cruise ships. Dawsey has not submitted any evidence to establish that Carnival should have known that Steiner (in general) or Pantaleon (in particular) were unfit to provide bamboo massages to passengers. Dawsey's negligent selection and negligent retention theories against Carnival are therefore unsuccessful. Third, Dawsey has likewise not submitted adequate evidence to establish that Carnival had a duty to warn passengers about massages given in the Steiner-operated spa.

## I. Factual and Procedural Background

### A. *The Amended Complaint*

Dawsey's amended complaint is the operative pleading. [ECF No. 23]. Because Dawsey now, after Defendants filed their summary judgment motions, argues that she has evidence to support an actual agency and apparent agency claim against Carnival, it is critical to examine the amended complaint and focus on what Dawsey alleges -- and what she does *not* allege.

Dawsey asserts a negligence count against Carnival (Count I), a negligence count against Steiner (Count II), and a negligence count against the Steiner-hired masseuse alleged to have fractured her hip during the bamboo massage, Pantaleon (Count III). It does not appear that Pantaleon, whose address is listed as being in the Philippines, was ever served, and no responsive pleading was ever filed by her or on her behalf.

The negligence count against Steiner alleges myriad subcategories of negligence:

(1) failure to have proper policies and procedures for giving massages to passengers; (2) failure to properly supervise masseuses; (3) failure to warn Dawsey of the dangers to her of receiving a massage; (4) failure to properly train masseuses; (5) failure to properly hire or train masseuses who give massages to passengers with prior injuries; (6) failure to adequately investigate employees; (7) failure to investigate the qualifications and experience of the employees hired to provide services to passengers; and (8) acting unreasonably by hiring Pantaleon to provide services to passengers "in light of the information they knew or should have known." [ECF No. 23, pp. 6–7]. The amended complaint then alleges that Pantaleon failed to use proper massage techniques and fractured Dawsey's hip to the point that Dawsey was nearly unable to walk and required hip replacement surgery.

The sole count against Carnival alleges negligence by (1) failing to post signs warning that massages could result in injury; (2) failing to properly train its **contractors** in the proper methods of massage to avoid causing injury to passengers; (3) failing to properly monitor and control "the activities of people it allowed to render these unsafe procedures to its ticketed passengers"; (4) failing to implement a reasonable and safe operation to prevent dangerous conditions; (5) failing to appropriately investigate the qualifications and experience of persons "hired by its **vendor(s)**," i.e., Steiner, which would have revealed Pantaleon's unsuitability; (6) failing to properly investigate the qualifications and experience of the people hired by its **vendor** Steiner (who was

providing services to passengers); and (7) unreasonably hiring or authorizing Pantaleon to provide services to passengers in light of the information Carnival knew or should have known. [ECF No. 23, pp. 4–5 (emphasis added)].

There is no allegation that Steiner or Pantaleon are actual agents or apparent agents of Carnival. There are no allegations that Carnival controlled the spa or that Steiner reasonably appeared to be an agent of Carnival or that Dawsey detrimentally relied upon the appearance that Steiner was Carnival's agent. Indeed, **the allegations are to the contrary.** The amended complaint consistently and repeatedly describes Steiner as Carnival's independent *contractor* and describes Pantaleon as *Steiner's* employee.

Specifically, Dawsey alleges that "[t]he Cloud 9 Spa aboard the Vessel was **operated, managed and/or overseen by STEINER TRANSOCEAN.**" [ECF No. 23, p. 3 ¶ 13 (emphasis added)]. Likewise, in the negligence count against Steiner, Dawsey alleges that she "was a passenger aboard the ELATION who had gone to the spa **operated by Defendant STEINER TRANSOCEAN**, to enjoy a massage and/or other similar services." [ECF No. 23, p. 6 ¶ 6 (emphasis added)]. As noted above, in the negligence count allegations against Carnival, Dawsey alleges that Carnival breached its duty of due care by "[f]ailing to properly train its **contractor(s)** [as opposed to its *agents* or *apparent agents*] in the proper methods of massage so as to avoid causing injury to its passenger." [ECF No. 23, p. 4 ¶ 19(b) (emphasis added)]. And in the count against

Pantaleon, she alleges that Pantaleon "was hired, contracted and/or employed by **STEINER TRANSOCEAN,** to work as a masseuse aboard the Vessel in the Cloud 9 Spa." [ECF No. 23, p. 8 ¶ 28 (emphasis added)].

B. *Undisputed Material Facts*

Recall that some facts represented by Carnival to be undisputed triggered a response from Dawsey that did not directly reveal whether she was challenging the specific fact as being undisputed. Instead, Dawsey would point to a *different* fact -- but without disclosing whether she intended the response to create a genuine factual dispute about the specific factual point alleged.

By way of example, in paragraph one of its statement of material facts, Carnival alleges that "Steiner is the leader in its spa services industry, and works with every major cruise line." [ECF No. 37, p. 2]. Dawsey responded as follows: "Carnival representative had no knowledge of the training of their concessionaire's employees who they knew were going to be providing services to their passengers. Carnival did not know how many employees of Steiner were placed on their ship to provide services to their passengers." [ECF No. 40, p. 2]. This is a non-response. It does not say whether Carnival's paragraph one statement is disputed, and it says nothing about Steiner being an industry leader or working with major cruise lines. Instead, it raises a different factual assertion.

To provide another illustration, in paragraph nine of its statement of material

facts, Carnival alleges that it "is not involved in the screening or vetting of any Steiner employees" and it "does not investigate or otherwise verify the qualifications or the experience of any Steiner employees." [ECF No. 37, p. 3]. Again, Dawsey gives a non-response response. She does not say whether she views paragraph nine as disputed. Instead, she gives the following statement, which is, for all practical purposes, a representation about *other* facts, designed to bolster a different argument:

> Carnival had no idea who their concessionaire used to vet the people who were going to be providing services to its passengers. Carnival agrees it owes reasonable care to its passengers but disputes it has a duty to keep them free from harm. Carnival had no idea how many claims had been made by its passengers for injuries they have sustained at the spa run by its concessionaire.

[ECF No. 40, p. 3]. This response is completely silent on the key issue of this paragraph: whether Carnival is involved in the screening or investigation of Steiner employees.

There are several other non-responses made by Dawsey in response to Carnival's summary judgment motion, but here is one additional example: in numbered paragraph 21 of its statement of material facts, Carnival alleges that "[t]he masseuse received training and massage certifications in her home country of the Philippines prior to working with Steiner." [ECF No. 37, p. 4]. But Dawsey gives another non-response, as she dodges the direct point and asserts a different one: "The Plaintiff is aware of no requirement that Steiner is required to hire undertrained personnel from foreign countries." [ECF No. 40, p. 4].

These types of non-response responses are not helpful. Moreover, they generate

more work for the Court, because I cannot, without further probing, directly discern whether a specific paragraph is disputed or not (or whether the nonmovant claims it is disputed). Nevertheless, notwithstanding the additional analysis required (and actually undertaken) because of the non-response responses, the undisputed material facts are straightforward:

Steiner is the leader in its spa services industry, and it works with every major cruise line. [ECF No. 37, p. 2 ¶ 1]. Carnival and Steiner have maintained a business relationship for more than 20 years. *Id.* at ¶ 3. The Concessionaire Agreement between Carnival and Steiner states that "CARNIVAL and CONCESSIONAIRE understand and agree that neither is an agent of, joint venture, or partner of the other." *Id.* at ¶ 4.

The spas on all Carnival ships are identified as "Spa Carnival." [ECF No. 40-1, p. 20]. The ticket contract, however, notifies guests that an independent contractor operates the spas, as does the consultation form that Dawsey filled out. [ECF No. 44, p. 1 ¶ 6]. The form states that "all spa . . . services are provided exclusively as a convenience to me by Steiner Transocean Ltd. and I accept the service(s) at my own risk and expense without liability or responsibility to the cruise line, the vessel or their affiliates." [ECF No. 37-8, p. 1].

Carnival was aware of Steiner's dominant position in its industry when they entered into their independent contractor relationship. [ECF No. 37, p. 3 ¶ 5]. Steiner operates spas on more than 125 cruise ships worldwide and for every major cruise line

brand. *Id.* at ¶ 6. Carnival does not dictate to Steiner how to run the spa. *Id.* at ¶ 7. Carnival relies on Steiner to do the training, vetting, and hiring of its masseuses. [ECF No. 40-1, p. 16]. Carnival does not know the training a person receives in the Philippines to become a masseuse and does not know what training the masseuse at issue received. *Id.*

Carnival does not know how many claims have been made against Steiner by persons injured in Carnival's shipboard spas. [ECF No. 40-1, p. 12]. Carnival's corporate representative testified that there have been "[v]ery few" such claims over the past 13 years (though she also admitted that she had not specifically looked for the precise number). [Ex. 40-1, p. 14].

Carnival is not involved in the screening or vetting of any Steiner employees, and Carnival does not investigate or otherwise verify the qualifications or experience of any Steiner employees. [ECF No. 37, p. 3 ¶ 9]. Likewise, Carnival is not involved in the hiring process for Steiner's employees. *Id.* at ¶ 12. Carnival has not asked Steiner to screen its masseuses more carefully. *Id.* at ¶ 11.

Carnival is not involved in the day-to-day operations of Steiner or the shipboard spas or the spa employees. *Id.* at ¶ 10. Steiner bears sole responsibility for the management, supervision, and control of its spa facilities and its employees, other than routine maintenance and cleaning of that portion of the vessel. *Id.* Carnival relies on Steiner to use the highest industry standards, and Carnival's corporate representative

has never seen a situation in her 13 years with the company where Steiner has not lived up to those standards. [ECF No. 40-1, p. 18].

Under Carnival's view of general maritime law, the captain of a Carnival ship could ask anyone on board to leave and could eject a Steiner employee who committed a crime on the vessel. *Id.* at p. 26. Carnival has removed one or two Steiner Spa employees from vessels in the past 13 years. *Id.* at p. 27. Because the allegations were criminal, law enforcement officials became involved. *Id.*

Dawsey received from Steiner masseuse, Pantaleon, a bamboo massage, which involves heated bamboo rods being rolled over the client's body. [ECF No. 37, pp. 3–4 ¶¶ 13–14]. Dawsey filled out a form before the massage and listed a C-section and seasonal allergies as health issues/history. [ECF No. 37-8, p. 1]. She wrote "neck back /hip" in response to the question, "Where is your pain?", and designated muscular (as opposed to joint pain) as the type of pain that she was having. *Id.* She also wrote, "focus on neck right side and hip left," in response to the question, "Is there a specific request you have with regards to the area of pain?" *Id.*

Before the cruise at issue, Steiner never received a complaint about Pantaleon. [ECF No. 37, p. 4 ¶ 20]. As required, Steiner hired the masseuse through a Philippines overseas employment agency. *Id.* at ¶ 22. Pantaleon received training and massage therapy certifications in the Philippines before working with Steiner, which then trained her in bamboo massage and issued her a certification from the Steiner training facility.

[ECF Nos. 36, p. 2 ¶ 4; 37, p. 4 ¶ 23].

During her deposition, Dawsey revealed that she suffered a herniated disc in her neck in a 1999 car accident. [ECF No. 37, p. 5 ¶ 27]. She denied any other disc injuries (because she did not have them). [ECF Nos. 37, p. 5 ¶ 27; 40, p. 5 ¶ 27]. She also denied sustaining a prior hip injury (because she did not have one). [ECF Nos. 37, p. 5 ¶ 28; 40, p. 5 ¶ 28]. Dawsey also denied ever complaining to Dr. Susan Bryant-Snure (an orthopedist) of hip pain and did not recall whether she had ever complained to her of low back pain. [ECF No. 37, p. 5 ¶ 32].

Before the bamboo massage, Dawsey denied ever complaining to any doctor of hip or low back pain. *Id.* at ¶ 33. She was never diagnosed with a fractured hip before undergoing the bamboo massage. [ECF No. 40, p. 8 ¶ 41]. Defendants filed no medical records which indicate that Dawsey was ever diagnosed with a hip fracture before the bamboo massage. [ECF No. 40, p. 9 ¶ 44]. There are also no clinical records before September 15, 2015, dating back 16 years, which show that Dawsey was ever treated for a hip fracture. *Id.*

Since April 2002, Dawsey consistently received injections for pain no less often than every four months. [ECF No. 37, p. 6 ¶ 35]. She was repeatedly diagnosed with cervicalgia, lumbago, cervical disc degeneration, thoracic sprain/strains, radiculitis, spinal enthesopathy, and cervical disc displacement. *Id.* At Dawsey's visit with Dr. Bryant-Snure in July 2015, two months before the bamboo massage, she was diagnosed

with brachial neuritis, displacement of the cervical intervertebral disc, cervical somatic dysfunction, and spinal enthesopathy. *Id.* at ¶ 37.

Dawsey did not feel her hip break during the massage. [ECF No. 36, p. 3 ¶ 8]. And she did not ask to speak with a Steiner supervisor. *Id.* at ¶ 10.

After returning to her New Orleans home after the cruise on September 21, 2015, Dawsey saw Dr. Alexander Hoag and complained of pain from a bamboo massage. [ECF No. 40, p. 9 ¶ 46]. X-rays performed on that date show a fractured hip. *Id.*

Dawsey had documented hip pain on October 7, 2015. *Id.* at ¶ 48. On October 13, 2015, a pain specialist, Dr. Phillip Green, saw Dawsey for left hip pain following the bamboo massage. *Id.* at p. 10 ¶ 49. She received a pain injection during that doctor visit. *Id.*

## II.     Applicable Legal Standards and Analysis

"Summary judgment is appropriate where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Jurich v. Compass Marine, Inc.*, 764 F.3d 1302, 1304 (11th Cir. 2014). To make this determination, we view all facts and resolve all doubts in favor of the nonmoving party. *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1247 (11th Cir. 2013).

### A.     *Steiner's Summary Judgment Motion*

Steiner asserts two grounds for obtaining summary judgment in its favor. First, Dawsey cannot establish that the massage proximately caused her injuries because she

has no expert medical testimony to establish it. Second, her claim is fraudulent because she lied at her deposition about preexisting injuries and should, therefore, be saddled with the extreme sanction of an adverse summary judgment because of her purported misconduct.

The first ground is moot. Dawsey was permitted to submit expert opinion testimony about causation; she did so, and the Court denied Defendants' motions to exclude the testimony. [ECF Nos. 54; 79; 85]. Nothing further needs to be discussed.

The second ground concerns Steiner's argument that the Court should dismiss Dawsey's case because "it has become apparent that it is a fraud." [ECF No. 36, p. 9]. To support its fraud-on-the-court theory, Steiner contends that Dawsey (1) denied ever sustaining a hip injury and could not recall receiving x-rays other than on her neck; (2) denied going to a general physician because she was "pretty healthy"; (3) denied complaining to her orthopedist of hip pain and did not recall whether she had ever complained to her about low back pain; and (4) denied ever complaining to any doctor about hip or low back pain. [ECF No. 36, pp. 9–12]. Steiner contends that these alleged misstatements were "both calculated and selective in an attempt [to] establish and enhance her claim." *Id.* at p. 12.

But Dawsey's response notes that she never had a prior hip injury and that none of the pre-cruise medical records discuss a hip injury. Although Dawsey denied going for routine physicals with a general physician, Steiner has not submitted evidence to

establish that she had routinely seen non-specialist doctors. And her treatments by her orthopedist were for a neck injury, not a hip injury. In its reply, Steiner concedes that Dawsey's prior medical records do not show a hip fracture. [ECF No. 43, p. 4 ¶ 34]. It also explained that it "never once contended that Plaintiff previously suffered a hip fracture." [ECF No. 43, p. 8]. Nevertheless, Steiner has not abandoned its position that Dawsey tried to "conceal her significant medical history." [ECF No. 43, p. 9].

Dawsey further explains that 13 years of medical records are devoid of any clinical entry indicating hip pain until *after* the bamboo massage. She also clarified that she did not deny having complaints of hip pain before the massage. And she highlighted the fact that she listed hip pain on her pre-massage questionnaire.

Moreover, although Steiner focuses on the fact that Dawsey herself did not produce any medical records, she disclosed the names of her past treating physicians. And she completed authorizations for the Defendants to obtain all of her past medical records.

To be sure, Dawsey did not list all her prior medical history on the two-page questionnaire she submitted before the massage.[1] And perhaps her answers there were

---

[1]     The first page of the form requests medical information: "In order to properly perform your service(s) and avoid possible contraindications, please list all health issues, including surgeries, conditions, allergies, and treatment plans either diagnosed or prescribed within the last three years. In addition, please list all medications you are currently taking." [ECF No. 37-8, p. 1]. Dawsey provided a succinct response: "Estroil, vitamins[,] C-section 1995 [and] seasonal allergies." *Id.* But she also explained in writing that she had pain in her neck, back, and hip, and she asked the masseuse to focus on the

less than complete. But Dawsey would not have then had a motivation to intentionally conceal her prior medical history because she had not yet had the massage that purportedly fractured her hip.

To the extent a defendant believes that the plaintiff was untruthful, the appropriate remedy is "to bring those untruths to light at trial." *Bryant v. Troutman*, No. 3:05CV162-J-20MCR, 2006 WL 1640484, at *2 (M.D. Fla. June 8, 2006) (denying defense motion for a with-prejudice dismissal for alleged fraud on the court).

Proving a fraud on the court requires "clear and convincing evidence" and "an unconscionable plan designed to improperly influence the court in its decision." *Johnson v. Law Offices of Marshall C. Watson, PA*, 348 F. App'x 447, 448 (11th Cir. 2009). A party must show "more than inconsistencies." *Tarasewicz v. Royal Caribbean Cruises Ltd.*, No. 14-CIV-60885, 2016 WL 3944176, at *4 (S.D. Fla. Feb. 9, 2016), *report and recommendation adopted*, 2016 WL 3944178 (S.D. Fla. Mar. 17, 2016). Although inconsistent statements may be intentional at times, they are more often related to "completely innocuous reasons, such as faulty memory or a misperception of the events at the time they occurred." *Id.* at *6 (quoting *Bender v. Tropic Star Seafood, Inc.*, No. 4:07-CV-438-SPM, 2008 WL 4097602, at *3 (N.D. Fla. Sept. 3, 2008) (denying amended motion to dismiss and finding that plaintiff's inconsistent and contradictory statements did not constitute clear and convincing evidence of fraud on the court)).

---

right side of her neck and left hip. *Id.*

Framed by the circumstances of this case, the Court finds particularly applicable the discussion and analysis provided in *Bender:*

> As evidenced by the clear and convincing standard, dismissal is "an extreme remedy, and should not lightly be engaged."
>
> The "power to resolve disputes over the truth or falsity of claims belongs to a jury." "In determining which cases are egregious enough to warrant dismissal, courts have been mindful that '[t]rials result from factual disputes. In these disputes, the facts on one side are, at best, less true and, at worse, false or fraudulent.'" Thus, in many cases, factual inconsistencies can be resolved by the jury. "Generally speaking, only the most egregious misconduct, such as bribery of a judge or members of a jury, or the fabrication of evidence by a party in which an attorney is implicated, will constitute a fraud on the court." Fraud on the court is "only that species of fraud which does or attempts to, defile the court itself, or is a fraud perpetrated by officers of the court so that the judicial machinery cannot perform in the usual manner its impartial task of adjudging cases that are presented for adjudication."

*Bender*, 2008 WL 4097602, at *2–3 (internal citations omitted).

Dawsey provided the Defendants with the name of every doctor she had seen in the past 20 years, making inapplicable *Hull v. Municipality of San Juan*, 356 F.3d 98 (1st Cir. 2004), which Steiner relies on. In *Hull*, the case was dismissed because the plaintiff failed to disclose his prior injuries when specifically asked during his deposition. *Id.* at 101. In addition, the trial court found the existence of a broad pattern of deceit, and the deceitful plaintiff was not a neophyte (because he was the president of a firm that sold structured settlements to law firms and his wife was a claims manager for a large insurance company). *Id.* Moreover, the appellate court explained that it could not "excuse the misstatements and omissions as merely careless." *Id.* at 102.

The facts here are not as egregious. Even if the Court agreed that Dawsey "might not have acted in complete good faith during the discovery process," the evidence does not show that her behavior rose "to the level of willful misconduct substantiating dismissal." *Deshon v. Circle K Stores, Inc.*, No. 17-CV-80482, 2018 WL 566840, at *2 (S.D. Fla. Jan. 26, 2018) (denying motion for involuntary dismissal for alleged fraud on the court despite inconsistencies in the plaintiff's prior statements). The Court, therefore, denies Steiner's summary judgment motion for alleged fraud on the court.

**B.**     *Carnival's Summary Judgment Motion*

Carnival's summary judgment motion asserts four grounds, two of which have already been addressed and rejected: (1) that Dawsey did not present expert testimony linking her hip fracture to the massage (a now-moot argument), and (2) that Dawsey perpetrated a fraud on the Court (an overly-ambitious view, as outlined above).

Carnival, however, also asserts two additional, related grounds for summary judgment. First, Carnival asserts that it cannot be held liable for the alleged negligence of Steiner, an independent contractor, because Carnival diligently inquired into Steiner's fitness and found nothing to put it on notice of problems. Second, Carnival argues that it had no duty to warn because it had no notice of a risk-creating situation.

Federal maritime law applies to actions arising from alleged torts "committed aboard a ship sailing in navigable waters." *Keefe v. Bahama Cruise Line, Inc.*, 867 F.2d 1318, 1320 (11th Cir. 1989). The parties do not dispute that maritime law governs.

"[G]eneral maritime law is an amalgam of traditional common-law rules, modifications of those rules, and newly created rules." *E. River S.S. Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 864–65 (1986). Federal district courts in our circuit incorporate general common law principles and Florida state law (when applicable) to the extent they do not conflict with federal maritime law. *Smolnikar v. Royal Caribbean Cruises Ltd.*, 787 F. Supp. 2d 1308, 1315 (S.D. Fla. 2011).

### 1.    Negligent Selection/Retention

Although cruise ship owners, such as Royal Caribbean, cannot be held vicariously liable for the negligence of an independent contractor, it is well established that they may be liable for negligently hiring or retaining a contractor. *See Smolnikar*, 787 F. Supp. 2d  at 1318; *see also Wolf v. Celebrity Cruises, Inc.*, 101 F. Supp. 3d 1298, 1307 (S.D. Fla. 2015), *aff'd*, 683 F. App'x 786 (11th Cir. 2017) (same).

Under Florida law, a principal may be subject to liability "for physical harm to third persons caused by his failure to exercise reasonable care to employ a competent and careful contractor (a) to do work which will involve a risk of physical harm unless it is skillfully and carefully done, or (b) to perform any duty which the employer owes to third persons." *Suarez v. Gonzalez*, 820 So. 2d 342, 345 (Fla. 4th DCA 2002) (quoting Restatement (Second) of Torts § 411 (1965)). Where such a duty exists, a plaintiff bringing a claim for negligent hiring or retention of an independent contractor must prove that "(1) the contractor was incompetent or unfit to perform the work; (2) the

employer knew or reasonably should have known of the particular incompetence or unfitness; and (3) the incompetence or unfitness was a proximate cause of the plaintiff's injury." *Davies v. Commercial Metals Co.*, 46 So. 3d 71, 74 (Fla. 5th DCA 2010).

Negligent selection and negligent retention claims differ in one respect: "the time at which the [principal] is charged with knowledge of the [contractor's] unfitness." *Smolnikar*, 787 F. Supp. 2d at 1318 n.7 (quoting *Garcia v. Duffy*, 492 So. 2d 435, 438 (Fla. 2d DCA 1986)). Negligent selection claims are premised on the principal's inadequate pre-selection investigation into the contractor's background. *Id.* But negligent retention claims are premised on the principal's failure to investigate or terminate the contractor when, during the course of the contractor's employment, the principal was aware or should have been aware that the contractor was unfit. *Id.*

In determining whether Carnival knew or reasonably should have known of Steiner's alleged incompetence, the relevant inquiry is whether Carnival "diligently inquired" into Steiner's fitness. *Id.* at 1319; *see also Jackson v. Carnival Cruise Lines, Inc.*, 203 F. Supp. 2d 1367, 1374 (S.D. Fla. 2002) (explaining that shipowner's duty to use reasonable care in selecting a competent independent contractor for the ship's medical staff is "sufficiently fulfilled when the physician's fitness is diligently inquired into").

Carnival has not taken the position that it did not have a duty to properly select Steiner as an independent contractor to provide shipboard massages to passengers in the spa. So the relevant question is whether there is a disputed issue of material fact

about the elements required to prove that Carnival negligently selected and/or retained Steiner for the spa operation. In other words, the issue is whether a reasonable jury on this record could find that Dawsey proved the requisite elements.

A plaintiff who brings a negligent hiring/retention claim "need only 'plead[ ] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged[.]'" *McLaren v. Celebrity Cruises, Inc.*, No. 11-23924-CIV, 2012 WL 1792632, at *7 (S.D. Fla. May 16, 2012) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). But "on a motion for summary judgment a defendant-employer can offer facts of its own which affirmatively prove it is not liable for the misconduct." *Id.* "And if a defendant-employer can offer facts showing it conducted a diligent inquiry into the contractor's fitness and failed to discover anything alarming, then it cannot be said that the employer 'should have known' of a particular unfitness. *Id.*

Federal district courts in our circuit do not hesitate to grant summary judgment to a defendant on a negligent selection/retention claim when the employer makes the requisite evidentiary showing and the plaintiff offers only speculative theories or evidence-free allegations. *See, e.g., Wolf v. Celebrity Cruises, Inc.*, 683 F. App'x 786, 796 (11th Cir. 2017) (affirming summary judgment for defendant on negligent selection/retention claim against cruise ship in lawsuit over injuries sustained during zip-line excursion on a private nature reserve in Costa Rica); *Smolnikar*, 787 F. Supp. 2d at 1322 (granting summary judgment to defendant cruise ship operator in case

involving injury to passenger during an offshore zip-line excursion in Montego Bay, Jamaica).

A critical factor in *Wolf* was that "[t]he record [was] devoid of evidence demonstrating that [the independent contractor] was incompetent or unfit to perform" the services -- "much less that [the cruise ship operator] knew or should have known of any deficiencies." *Wolf*, 683 F. App'x at 796. The plaintiff there argued that the cruise ship operator did not adequately conduct inspections of its contractor's zip-line tour. *Id.* He relied on an expert report which stated that standards developed by the Association for Challenge Course Technology (ACCT) require annual inspections by a qualified professional inspector. *Id.* But the appellate court noted that the plaintiff "failed to present sufficient evidence that the ACCT regulations reflect industry custom or standards." *Id.* at 795. Therefore, the Court held that the expert's testimony about the ACCT standards was "insufficient to establish a standard of care against which a jury could measure [the cruise ship operator's] actions." *Id.* at 796.

In *Smolnikar*, the Court assessed the diligent inquiry issue by looking at several other factors as well: (a) the lengthy, incident-free relationship between the cruise line and the tour operator; (b) the operator's first-class reputation; (c) the positive feedback from the cruise line's passengers; (d) the lack of knowledge of accidents on the zip-line excursion; (d) that other cruise lines used the zip-line excursion; (e) that the tour operator met the insurance requirement; (f) that the cruise line's own representatives

had viewed the zip-line excursion; (g) the lack of accident reports from the zip-line excursion; and (h) the absence of comment forms or surveys from passengers indicating that the independent contractor was unfit to operate the zip-line tour. *Smolnikar*, 787 F. Supp. 2d at 1319. The Court also noted that no Florida case or general federal common law principle required the cruise ship operator to conduct its own inspection of an independent contractor's operations. *Id.* at 1320–21.

Here, Carnival contends that it reasonably inquired into Steiner's fitness, pointing to several factors: (a) before entering into the concessionaire agreement with Steiner in 1996, Carnival was already aware of Steiner's dominant reputation in the spa industry and was familiar with its operations as the leading provider of spa services on cruise ships worldwide; (b) Steiner's services have always been, and continue to be, widely used throughout the cruise industry; (c) Steiner operates spas on more than 125 vessels for every major cruise line; (d) Steiner has always maintained an exceptional reputation in its industry; (e) Steiner's reputation in the industry is considered the "gold standard"; (f) Steiner and Carnival have continued their business relationship for more than 20 years; (g) Steiner is used by almost every major cruise line; (h) Steiner is required to use the highest industry standards, and Carnival has never seen a situation where it has failed to do so; (i) Carnival's corporate representative testified that there have been "very few" claims about Steiner's services for Carnival passengers in her nearly 13 years with the company; and (j) Carnival had never had a reason since 1996

(when the independent contractor business relationship was established) to inquire into Steiner's fitness as an independent contractor operating the onboard spas. [ECF No. 37, pp. 10–11].

Dawsey's response to this portion of the summary judgment motion is succinct: one paragraph of four sentences. [ECF No. 40, p. 13]. Given the brevity, the Court can easily quote it verbatim:

> Since initially entering into a contract with Steiner in 1996, Carnival has done nothing to determine what services Co-Defendant Steiner has provided to Carnival's paying guests that have resulted in injuries. Carnival undertook no investigation to determine how many of its passengers had been injured or claimed to have been injured at one of its spas operated by Steiner in the past. Carnival could have made an inquiry to Steiner regarding claims made against them for passengers claiming injuries from the spa services yet never took the time to do so. Carnival failed to monitor Steiner who provided services to its passengers.

*Id.*

In other words, Dawsey contends that Carnival failed to do two things that it could have and should have done to avoid being liable to passengers for its independent contractor's negligence: (1) probe its 13-year relationship with Steiner to determine which spa services generated injuries to passengers, and (2) investigate how many passengers were injured from Steiner-provided services at onboard spas.

Although Carnival may not have specifically investigated the number of passenger claims Steiner received from spa services or the nature of the services that generated claims, the undisputed record evidence shows that Carnival never had a

reason to make such an inquiry. The undisputed record evidence also shows that Carnival knows that there have been at most only "very few" claims from its passengers about Steiner's spa services over a 13-year period. Carnival's representative would have known about other claims because they would have been brought to her attention.

Also, Dawsey has not called the Court's attention to any legal authority requiring Carnival to specifically ask its independent contractor to provide updates on the number of claims made by passengers or to outline which spa service generated a claim. Moreover, if summary judgment was properly entered (in *Wolf*) in favor of a cruise ship operator on a negligent selection/negligent retention theory when the plaintiff submitted expert testimony about at least some standards for required inspections, then it is certainly appropriate here, where Dawsey submitted no expert testimony on industry standards and simply argued that Carnival was required to uncover the number of claims and which spa service generated a claim.

The Court thus **grants** summary judgment in Carnival's favor on the issue of negligent selection/retention. Given that the undisputed evidence is that Steiner has a gold-standard reputation, provides spa services as an independent contractor to every major cruise line, and had at most a few isolated claims from Carnival passengers over 13 years, there is no legal basis to conclude that Carnival had a duty to specifically determine the number of claims or that a failure to obtain that precise information somehow creates liability under a negligent selection/retention theory.

### 2.      Duty to Warn

"It is a settled principle of maritime law that a shipowner owes the duty of exercising reasonable care towards those lawfully aboard the vessel who are not members of the crew." *Kermarec v. Compagnie Generale Transatlantique*, 358 U.S. 625, 630 (1959). In a maritime tort case, courts "rely on general principles of negligence law." *Chaparro v. Carnival Corp.*, 693 F.3d 1333, 1336 (11th Cir. 2012). To establish negligence, a plaintiff must show that "(1) the defendant had a duty to protect the plaintiff from a particular injury; (2) the defendant breached that duty; (3) the breach actually and proximately caused the plaintiff's injury; and (4) the plaintiff suffered actual harm." *Id.*

The existence of a duty is a question of law. *Virgilio v. Ryland Grp., Inc.*, 680 F.3d 1329, 1339 (11th Cir. 2012). A shipowner generally owes to its passengers a duty to exercise "reasonable care under the circumstances." *See Franza v. Royal Caribbean Cruises, Ltd.*, 772 F.3d 1225, 1233 (11th Cir. 2014). This includes "a duty to warn of known dangers beyond the point of debarkation in places where passengers are invited or reasonably expected to visit." *Chaparro*, 693 F.3d at 1336 (citing *Carlisle v. Ulysses Line Ltd., S.A.*, 475 So. 2d 248, 251 (Fla. 3d DCA 1985)).

The duty to warn, however, "encompasses only dangers of which the carrier knows, or reasonably should have known." *Id.* Accordingly, as a prerequisite to imposing liability, "the carrier [must] have had *actual or constructive notice of the risk-creating condition*; at least where the menace is one commonly encountered on land and

not clearly linked to nautical adventure." *Keefe v. Bahama Cruise Line, Inc.*, 867 F.2d 1318, 1322 (11th Cir. 1989) (emphasis added). And the duty to warn likewise does not extend to dangers that are apparent or obvious. *Isbell*, 462 F. Supp. 2d at 1238.

A cruise ship operator is not an insurer of its passengers' safety. *Kornberg v. Carnival Cruise Lines, Inc.*, 741 F.2d 1332, 1334 (11th Cir. 1984). So the occurrence of an injury does not automatically mean that the cruise line is liable to a passenger or is presumed to be on notice of a risk-creating condition. *Isbell v. Carnival Corp.*, 462 F. Supp. 2d 1232, 1237 (S.D. Fla. 2006); *see Wolf*, 683 F. App'x at 794 (affirming summary judgment for cruise ship operator on duty to warn claim because the cruise operator "had no notice of a dangerous condition" and had no reason to question the continued safety of its independent contractor's zip-line operation); *see also Smolnikar*, 787 F. Supp. 2d at 1323 (granting summary judgment to cruise ship operator on duty to warn claim because plaintiff submitted no evidence creating a dispute of fact about whether the cruise ship operator knew or should have known that there was any alleged safety issue at the location at issue on the zip-line tour).

In this case, there is no record evidence to support Dawsey's theory that Carnival knew or reasonably should have known of the danger or risk-creating situation involved in her claim. Carnival never received a complaint about the masseuse who gave her the bamboo massage. Dawsey also failed to submit any evidence of prior incidents involving fractures arising from bamboo massages in shipboard spas. And

there is no evidence about complaints or problems with Steiner as a spa operator.

*Wolf* is instructive on the issue of whether Dawsey can avoid summary judgment in Carnival's favor on the duty to warn claim. In affirming the trial court's summary judgment order in favor of the cruise ship, the appellate court noted that the independent contractor was regarded as an industry leader in canopy tours and the cruise operator selected it for this reason. *Wolf,* 683 F. App'x at 794. The same rationale applies to Carnival's selection of Steiner as its spa operator.

Although Carnival was aware of a few claims over a 13-year period, those claims do not appear to be in any meaningful way similar to the alleged risk or danger alleged here. Dawsey has not submitted any evidence to suggest that the claims were similar. Moreover, the one or two incidents that involved a follow-up law enforcement investigation presumably involved a spa employee who allegedly committed a crime, such as stealing a passenger's belongings or assaulting a spa client. Those isolated and unrelated incidents and claims do not generate a duty to warn about bamboo massages given by an allegedly incompetent, inadequately trained or careless masseuse. *See Krug v. Celebrity Cruises, Inc.,* No. 17-14819, 2018 WL 3860473, at *3 (11th Cir. Aug. 14, 2018) (affirming summary judgment for cruise ship operator on duty to warn claim because the cruise ship company did not have actual or constructive notice of the allegedly dangerous condition and noting that a general safety instruction was not evidence of an

intent to warn passengers about the specific dangerous condition alleged by plaintiff).[2]

The Court, therefore, **grants** summary judgment in Carnival's favor as to the duty to warn. To impose a duty to warn on Carnival on this record "would be akin to imposing strict liability upon" Carnival. *Wolf*, 683 F. App'x at 795.

### 3.     Actual and Apparent Authority

There is no dispute that actual agency and apparent agency are viable theories that could, under appropriate evidentiary circumstances, be successfully asserted against a cruise ship operator for the acts of its independent contractor. *Franza*, 772 F.3d at 1254. Carnival does not argue that agency is not a factual issue to be determined by the finder of fact, which would be the jury in the instant case. But the mere fact that these theories are legally available in the abstract hardly means that Dawsey can avoid summary judgment by raising those claims for the first time in a response memorandum.

As *Franza* explains, "actual agency and apparent agency are distinct theories of liability." *Id.* at 1249. For an actual agency relationship to exist, there must be three elements present: "(1) the principal to acknowledge that the agent will act for it; (2) the

---

[2]     The Court is also not convinced by Dawsey's succinct, three-sentence argument that Carnival should have warned her that bamboo massages are contraindicated for clients with osteoporosis. [ECF No. 40, pp. 12–13]. Dawsey was unaware that she had that condition at the time of her massage. In fact, Dawsey testified in her deposition that she had never been diagnosed with that condition before the cruise (and she did not list it as a condition on the questionnaire she filled out before the massage). [ECF Nos. 37-3, p. 5; 37-8, p. 1].

agent to manifest an acceptance of the undertaking; and (3) control by the principal over the actions of the agent." *Id.* at 1236.

By contrast, "the doctrine of apparent agency allows a plaintiff to sue a principal for the misconduct of an independent contractor who only reasonably appeared to be an agent of the principal." *Id.* at 1249. So for an apparent agency relationship to exist, these three elements are needed: "first, a representation by the principal to the plaintiff, which, second, causes the plaintiff reasonably to believe that the alleged agent is authorized to act for the principal's benefit, and which, third, induces the plaintiff's detrimental, justifiable reliance upon the appearance of agency." *Id.* at 1252.

Thus, a plaintiff like Dawsey seeking to impose liability under both an actual agency and apparent agency theory would need to allege six elements (three for each claim/theory). But Dawsey at no time asserted any of those required six elements in either her initial complaint or her amended complaint. Those pleadings describe Steiner as Carnival's independent contractor, not its actual or apparent agent.

And it is far from clear that Dawsey directly and affirmatively raised those theories in her opposition memorandum, either. She did not unequivocally assert in her memorandum opposing Carnival's summary judgment motion that Steiner was, in fact, Carnival's actual agent or apparent agent. Instead, she simply (and illogically) argued that "*Carnival* held itself out as the *agent for Steiner* by naming the spa on all of its ships 'Spa Carnival.'" [ECF No. 40, p. 12 (emphasis added)]. She then raised the theory that

"Steiner as Carnival's agent had authority to act for the benefit of the principal" and that Dawsey "believed Carnival controlled the spa and that belief was reasonable and she acted on that belief." [ECF No. 40, p. 12].

So Dawsey *argued* (as opposed to asserting a claim in her amended complaint) in the same paragraph in her opposing memorandum that Carnival was Steiner's agent and that Steiner was Carnival's agent. But even if Dawsey adequately asserted an agency theory for the first time in her memorandum response, that would be an example of "too little, too late" and would not prevent summary judgment in Carnival's favor on those claims.

Plaintiffs are not given the opportunity to raise new claims for the first time at the summary judgment stage. "At the summary judgment stage, the proper procedure for plaintiffs to assert a new claim is to amend the complaint in accordance with Fed.R.Civ.P. 15(a)." *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004). "A plaintiff may not amend her complaint through argument in a brief opposing summary judgment." *Id.*

Our circuit does not hesitate to apply the *Gilmour* rule by affirming summary judgment orders in favor of a defendant when a plaintiff tries to assert a new claim for the first time in a memorandum of law opposing a summary judgment motion. *See Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1297 (11th Cir. 2006); *Al-Amin v. Donald*, 165 F. App'x 733, 740 (11th Cir. 2006); *McShane v. U.S. Attorney Gen.*, 144 F.

App'x 779, 789 (11th Cir. 2005). Similarly, Florida district courts are not reluctant to rely on *Gilmour. See, e.g., Edwards v. Niles Sales & Serv., Inc.*, 439 F. Supp. 2d 1202, 1224–25 (S.D. Fla. 2006) (collecting both in-circuit and out-of-circuit cases); *Davis v. City of Lake City*, No. 3:10-CV-1170-J-34TEM, 2013 WL 12091324, at *11 (M.D. Fla. Mar. 15, 2013), *aff'd sub nom.* 553 F. App'x 881 (11th Cir. 2014).

Given this procedural background, Dawsey cannot now assert new claims for actual/apparent agency and therefore cannot rely on those doctrines to avoid summary judgment in favor of Carnival. Dawsey will be permitted to present to a jury her claim against Steiner, who managed the spa and who hired the masseuse who gave the bamboo massage at issue.

## III.    Conclusion

In short, the Court **grants** Carnival's summary judgment motion and **denies** Steiner's summary judgment motion.

**DONE and ORDERED** in Chambers, at Miami, Florida, on October 22, 2018.

Jonathan Goodman
UNITED STATES MAGISTRATE JUDGE

<u>Copies furnished to</u>:
All counsel of record